680 So.2d 1052 (1996)
Alberto BLASCO, Appellant,
v.
The STATE of Florida, Appellee.
No. 94-2970.
District Court of Appeal of Florida, Third District.
September 25, 1996.
Bennett H. Brummer, Public Defender, and Craig J. Trocino, Special Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General, and Joni Braunstein, Assistant Attorney General, for appellee.
Before COPE, GREEN and FLETCHER, JJ.
FLETCHER, Judge.
Defendant Alberto Blasco has appealed his convictions for two counts of driving under the influence causing serious bodily injury and one count of driving under the influence causing personal injury. Blasco contends that because the court reporter's stenographic notes of the State's rebuttal witnesses were lost, and the reconstructed record is *1053 insufficient to provide meaningful appellate review, this Court should reverse the convictions and remand for a new trial. After careful consideration, we conclude that the defendant is entitled to a new trial.
During the defense's case-in-chief opinion testimony was received by the jury which conceivably could have raised a reasonable doubt in the jurors' minds. The State felt constrained to present witnesses in rebuttal to this defense opinion testimony. We shall never know whether it was this rebuttal testimony that led to the jury's verdicts or whether the defendant's opinion testimony was rejected for other reasons, thus, we cannot know the specific importance of the rebuttal. However, as the rebuttal testimony could have been the convincing factor of guilt beyond a reasonable doubt, any error in regard thereto that was not harmless could have been the basis of reversal by this court (on proper appeal by Blasco). Unfortunately, because the notes are lost, and because the trial court's valiant attempt at reconstruction in the face of vague memories still leaves the record unresolved, we do not know, and are not capable of knowing, whether any reversible error was committed during rebuttal. For this reason we reverse the conviction and remand this matter for a new trial. See Rozier v. State, 669 So.2d 353 (Fla. 3d DCA 1996).
COPE, J., concurs.
GREEN, Judge, dissenting.
Based upon my review of the transcript of the trial from voir dire to sentencing, as well as the lower court's reconstructed record of the missing rebuttal testimony, I cannot agree that the record before us is insufficient for us to conclusively determine that no error occurred during the rebuttal phase of the trial which would have mandated a reversal of Blasco's convictions in this case.
Blasco was charged by information with two counts of driving under the influence causing serious bodily injury and one count of driving under the influence causing personal injury. These charges stemmed from a traffic accident occurring in Key West on January 24, 1994 at about 2:30 a.m. At the time, Blasco was driving his 1992 Acura Legend and crashed into a concrete wall while attempting to round a curve in the road. Blasco and his front seat passenger sustained relatively minor physical injuries as a result of this accident.[1] His two back seat passengers, however, sustained life threatening injuries.[2]
According to the transcript of the evidence adduced by the state in its case in chief, Blasco's blood alcohol level was above the legal limit at 0.13% some two hours after the crash. Blasco's passengers all testified that prior to the collision, Blasco had been playing a game of "tag" with another automobile driven by a Carlos Paez. When Paez passed Blasco, their testimony was that Blasco decided to "catch up" to pass Paez. Blasco's passengers also testified that Blasco had been travelling recklessly on the wrong side of the road and had increased his speed to at least 100 miles per hour. They further testified that they screamed at Blasco to slow his speed as he was approaching the wall on the curve, but to no avail. When it became evident to them that Blasco was going to drive into the wall, they fastened their seat belts and braced themselves for the crash.[3] They recalled seeing the car hit the wall, but after impact, they lost consciousness. Not one of these passengers testified that Blasco's air bag prematurely deployed prior to the car's impact with the wall.
Paez, the driver of the other car on the road, was called by the state to testify. Paez also testified that prior to the collision, Blasco was driving recklessly and at an excessive rate of speed. Paez further testified that Blasco did catch up with him and passed him. *1054 Paez estimated Blasco's speed to be approximately 130 miles per hour at the time, and Paez stated that he was concerned that Blasco would not make the curve at the end of the road as he saw no brake lights appear on Blasco's car prior to the crash.
A police officer on the scene also testified that there were no skid marks on the road to indicate any efforts by Blasco to brake prior to impact. Another police officer on the scene testified to a strong odor of alcohol on Blasco's breath and the presence of an alcoholic beverage in the car. This officer also testified that the cement wall was completely disintegrated after Blasco's car was pulled away from it. Finally, the state produced two witnesses who had seen Blasco approximately two to three hours prior to the crash. One of such witnesses saw Blasco with beer in his hand and opined that Blasco was intoxicated at the time. The other witness saw Blasco with a cup bearing the name of a local tavern in his hand, but admitted that she had no knowledge of the contents of the cup.
After the state rested, Blasco took the stand in this own defense. He admitted to consuming at least eight beers plus a "shot" of 90 proof crown royal liquor in the hours preceding the accident. He further admitted to racing with or engaging in a game of "tag" with Paez's automobile prior to the crash, but stated that he was going only 50-60 miles per hour when he approached the curve. He acknowledged that he was very familiar with the curve and intended to slow down but he suddenly blacked out or everything "went black or dark" on him. Interestingly, Blasco never testified that his air bag prematurely deployed on him even though that apparently was his defense at trial.[4] Blasco also testified that approximately four to six months prior to the accident, he was experiencing problems with the air bag light coming on but that he took the car in for repairs and the problem was apparently corrected.[5] Blasco further testified that after the accident, he noted that both the driver and front seat passenger's air bags had deployed and that his bloodied face had imprinted into the driver's air bag.
Blasco's estranged wife was then called by the defense. Mrs. Blasco testified that her husband had visited her shortly prior to the accident. While he was at her home, one of Blasco's male friends telephoned her to inquire, among other things, whether Blasco had arrived there "okay." Prior to visiting his wife, Blasco had been drinking beer with this friend. As a result of this call, the couple became embroiled in an argument and Blasco left. Mrs. Blasco further testified that she recalled that the air bag light had gone off in the Acura some months prior to the accident.
The final defense witness was David Potts, an accident reconstruction mechanic. Mr. Potts admittedly was not an engineer, has no specific training regarding air bags and has never measured air bags found in Acura Legends. Mr. Potts nevertheless opined *1055 that Blasco's air bag may have prematurely deployed prior to the car's impact with the wall. Mr. Potts arrived at this opinion the day before he testified at trial and based his opinion solely upon Blasco's statements about the accident and his injuries, the police report, and Mr. Potts' inspection of the vehicle at a junk yard some six months after the accident.[6] Mr. Potts also estimated Blasco's speed to be somewhere between 35-40 miles per hour at the time the car struck the wall notwithstanding Blasco's own admission that he was travelling between 55-60 miles per hour at the time of the accident.
When the defense rested its case, the state informed the court that it would be calling two rebuttal witnesses. One of these witnesses was a David Zalanka, a paramedic with fire rescue. Zalanka had taken a written statement from Blasco while en route to the hospital after the accident. In response to the court's inquiry, the state proffered to the court that Zalanka would testify that Blasco had admitted [to Zalanka] that he was wearing his seat belt at the time of the accident and that his air bag had deployed on the car's impact with the wall.
The state's final rebuttal witness was Dr. Robert McElroy. Although we have no proffer or written transcription of Dr. McElroy's testimony, we are capable of ascertaining the essence of his testimony from the closing arguments of both sides and the lower court's reconstructed statement of this portion of the missing record. Thus, we know that Dr. McElroy testified that he holds a master's degree in industrial engineering and is a certified accident reconstruction expert. In his testimony, he described how the air bag system worked and that it made a loud noise when it deployed. He also explained that if the driver's air bag had deployed prematurely, then so would the front passenger's air bag. On cross examination, however, the defense apparently attempted to get Dr. McElroy to concede that it was possible for only one of the air bags to prematurely deploy. Dr. McElroy further testified that according to a National Highway Transportation Safety Board ("NHTSB") report, there had been no reports of the premature deployment of air bags in the 1992 Acura Legend. Defense counsel argued to the jury that this testimony by Dr. McElroy was a lie because defense counsel contended that he too had the same NHTSB report and it contained three consumer complaints of the premature deployment of air bags. Defense counsel went on to tell the jury about the specifics of those complaints.[7]
In response to a directive from this court that the parties and lower court reconstruct the record on the state's rebuttal witnesses pursuant to Florida Rule of Appellate Procedure 9.200(b)(4), the trial counsel for the defense filed a statement which stated in relevant part that:
3. Furthermore, the Defendent [sic] argued that the air bag on his 1993 [sic] Accura [sic] malfunctioned causing it to deploy while he was driving towards the curves. The explosive force of this accidental *1056 deployment stunned him causing him to lose control of his vehicle.
4. The State's rebuttal case was the testimony of a fire rescue driver. The Defendant objected to the admission of his testimony on the grounds of discovery violation.
5. The State also offered on rebuttal the testimony of an accident reconstruction expert. This witness essentially perjured himself. The Court unfairly limited defense cross examination.
The prosecutor filed a response to the defense's statement as follows:
2. At trial the State presented two rebuttal witnesses: David Zalanka, a paramedic with fire rescue and Dr. Robert McElroy, an expert in accident reconstruction.
3. Mr. Zalanka testified from a document entitled "Life Fleet Atlantic Trip Report" (a copy of which is attached). In the first paragraph of the narrative portion there is a written note by Mr. Zalanka which states that the defendant told Mr. Zalanka he was wearing his seat belt and his air bag deployed on impact. This document had be [sic] provided by the State to Defense counsel with initial discovery.
4. The State's second rebuttal witness was Dr. Robert McElroy. Defense counsel tried to introduce on cross-examination, for the purpose of impeachment, a document that had not been provided to the State. The State objected and the document was excluded. The State does recall a Richardson Hearing during cross examination of Dr. McElroy but does not remember if it was as to the introduction of this document. The document, as best the State can recollect, purported to be a report of consumer complaints regarding Acura and among them one of an air bag malfunction.
5. As to the issue of the Dr. McElroy perjuring himself, the State cannot respond without a more specific allegation being presented.
6. As to the issue of the court unfairly limiting defense cross examination, the State cannot respond without a more specific allegation being presented.
The trial court resolved these respective statements made by the parties based upon the court's own independent recollection of what transpired during the state's rebuttal case. First, addressing the defense's objection to Zalanka's testimony on the grounds of a discovery violation, the trial court found that no such violation had occurred since Zalanka had been disclosed by the state to defense counsel during the initial discovery.[8] Further, we know from the available trial transcript that Zalanka was permitted only to testify about Blasco's statements made to him and Zalanka's actual report was never introduced into evidence.[9] Thus, it can readily be seen that absolutely no error occurred during this phase of the rebuttal case which would have warranted a reversal of Blasco's convictions by this court.
Next, as to the defense's assertion that the trial court unfairly limited the defense's cross examination of the state's expert witness, Dr. McElroy, the lower court specifically recalled and found as follows:
The State then called Dr. McElroy who testified in some technical detail as to the manner in which air bags are deployed, the wiring systems, and deployment and safety mechanisms. Defense counsel attempted to cross-examine Dr. McElroy by the use of a publication. The publication contained complaints which were unverified by the publishers and no causations were attributed to the various complaints. Defense counsel attempted to introduce the publication for the truth of its contents through the witness, Dr. McElroy. The Court sustained the objection and declined to allow *1057 the reading into evidence of the contents of the publication.
Based upon the Court's recollection in this regard as well as the closing arguments made by defense counsel in this regard, it is abundantly clear that defense counsel sought unsuccessfully to introduce his NHTSB report which contained the three consumer complaints about the premature deployment of air bags in 1992 Acura Legends through Dr. McElroy. The trial court not only refused to permit the introduction of this report into evidence, but it also prohibited the defense counsel from reading these consumer complaints contained in this report to the jury.
Assuming arguendo for a moment that this court deemed this to be error, it would nevertheless be harmless error. This is because notwithstanding the trial court's earlier ruling precluding the reading of the contents of these three consumer complaints to the jury, the defense counsel did manage to successfully read the nature of each of these three consumer complaints to the jury during his closing argument without objection from the state. See n. 7. Thus, the jury ultimately was made aware of these three consumer complaints about the premature deployment of air bags in the Acura Legend. Based upon such complaints, the defense counsel essentially portrayed the state's expert as a liar to the jury when the expert testified that the NHTSB had received no reports of the premature deployment of air bags in the 1992 Acura Legend.
Moreover, any supposed error resulting from the exclusion of this publication relied upon by the defense would have been harmless by virtue of the other independent evidence of guilt on the part of Blasco as well as the fact that Blasco never testified in this trial that his air bag actually prematurely deployed. See supra n. 4. The testimony to this effect came solely from Blasco's expert who offered this up as a possible explanation for Blasco's temporary "blackout" prior to the crash.[10] Thus, based upon what we have before us, I am completely at a loss to see how any error committed during Dr. McElroy's rebuttal testimony would have affected the outcome of this trial to warrant a reversal by this court.
It is important to note that on this appeal, Blasco does not assert that any specific reversible error occurred during the state's rebuttal case but merely asserts generally that he is entitled to a new trial because he believes the record before us on this phase of the trial is inadequate for appellate review.[11] The state correctly points out that in all of the cases relied upon by Blasco to support his argument, a new trial was granted where there was the complete absence of a trial transcript (or a significant portion thereof) and/or the parties and the trial judge were completely unable to reconstruct the proceeding from their independent recollection. Delap v. State, 350 So.2d 462 (Fla.1977)(granting a new trial in a capital case where the transcript of the jury charge conferences, charge to the jury in both the trial and penalty phases, voir dire of the jury, and closing arguments of counsel in both trial and penalty phases were unavailable); Fairell v. State, 662 So.2d 428 (Fla. 3d DCA 1995)(reversing a conviction and remanding for a new trial where the trial transcript was lost and defense counsel's memory of the events was insufficient for a reconstruction of the proceedings); Ariko v. Nicholson, 606 *1058 So.2d 435 (Fla. 5th DCA 1992)(ordering a new trial where the court reporter's notes of six days of a ten day trial were destroyed by fire, the parties could not agree on a reconstructed record, and the trial judge had no memory of the proceeding); Lee v. State, 499 So.2d 66 (Fla. 3d DCA 1986)(ordering a de novo hearing on the defendant's motion to suppress where the record of the original suppression hearing was unavailable; the reconstructed record was deemed inadequate due to the fading memories of the parties and the trial court; and the trial court could not resolve disputes about what transpired at the original hearing); Jackson v. State, 308 So.2d 600 (Fla. 3d DCA 1975)(ordering a new trial where appellant was unable to secure trial testimony from the court reporter and the parties were unable to reconstruct the record after a diligent effort as attested to by the trial court); see also Rozier v. State, 669 So.2d 353 (Fla. 3d DCA 1996)(holding that where the voir dire transcription notes could not be located and this portion of the trial could not be reconstructed, a new trial had to be ordered where it was clear that peremptory challenges had been exercised by both sides). Respectfully, I do not believe that the same can be said of the case before us. In the words of our supreme court:
The present case involves omission of a much more limited portion of the trial and the trial court found that it was possible to assemble a reasonably accurate reconstruction of what was said. We therefore find that the reconstructed record of the unrecorded argument of the prosecutor is an adequate record upon which to perform the appellate review process.
Craig v. State, 510 So.2d 857, 861 (Fla.1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988). Not only is the record of the critical rebuttal evidence evident to us and adequate for our review, it conclusively dispels any suggestion that reversible error occurred during this phase of the trial.
As to his remaining point on appeal, Blasco argues that the trial court erred during the state's case in chief when it allowed the results of his blood alcohol test to be admitted into evidence where the blood sample was drawn approximately two hours after Blasco was operating his car. In Miller v. State, 597 So.2d 767 (Fla.1991), our supreme court found that "the inability of the State to `relate back' blood alcohol evidence to the time the defendant, was driving a vehicle is a question of credibility and weight-of-the-evidence, not admissibility, provided the test is conducted within a reasonable time after the defendant is stopped." The court further stated:
What is "reasonable" in this context will depend upon the facts of each case. As a general rule, we believe a test is conducted at an unreasonable time if the results of that test do not tend to prove or disprove a material fact, or if the probative value of the evidence is outweighed by its potential to cause prejudice or confusion.
Id. at 770. The Miller court found that a blood alcohol test administered to Mr. Miller one hour and twenty minutes after he was stopped was not unreasonable.
Very shortly thereafter, in Haas v. State, 597 So.2d 770 (Fla.1992) the supreme court reiterated its holding in Miller and further held that "[p]roperly obtained test results which reflect a blood-alcohol level of 0.10 or more, standing alone, constitute circumstantial evidence upon which the finder of fact may (but is not required to) convict the accused driver of DUI either by impairment or DUBAL." Id. at 774. In Haas, the blood alcohol test was administered one hour and twenty minutes after the accident.
Blasco apparently attempts to distinguish Miller and Haas by arguing that his blood alcohol test was administered over some two hours after the accident and as such, was patently unreasonable. In reliance upon Miller, however, this court has specifically found a two hour delay in administering a blood alcohol test not to be unreasonable. See Tracton v. City of Miami Beach, 616 So.2d 457, 458 (Fla. 3d DCA 1992)(finding the exclusion of results of appellant's blood alcohol level test administered approximately two hours after her arrest to be error; the fact of a delay went to the weight rather than admissibility of the evidence), rev. denied, 626 So.2d 207 (Fla.1993); Gallagher v. State, 606 So.2d 1236 (Fla. 3d DCA 1992)(holding results of a test administered two hours and *1059 twenty-two minutes after an accident admissible because they were conducted within a reasonable time and their probative value outweighed the potential for prejudice). Likewise, we must find in this case that the admissibility of the results of Blasco's blood alcohol test was not error.
For all of the foregoing reasons, I would affirm the conviction and sentence under review.
NOTES
[1] During its closing argument, the state emphasized this fact to the jury to support its theory that both air bags were properly deployed on impact.
[2] One passenger sustained a ruptured spleen and injuries to the colon and intestines which required emergency surgery. The other back seat passenger's skull was fractured and this passenger had to be transported to a hospital in Miami.
[3] During the cross examination of Blasco's passengers, it was brought out that they had each filed civil suits against Blasco for their injuries.
[4] Still more interesting, at his sentencing hearing, Blasco admitted under oath to his defense counsel that he never testified at trial that his air bag prematurely deployed:

Q. Now, to this day to do you know exactly what caused, as you described things, to go black on you?
A. No. I believe the air bagI am not exactly sure.
Q. Do you recall testifying in court to what you are testifying to now?
A. Yes.
Q. Okay. Did you although we put on a defense involving air bags, did you ever testify that you actually saw the air bag deploy?
A. No.
Q. Causing this blackness?
A. No.
Q. Was your testimony simply that you were looking out the window and you saw everything blacked out?
A. Yes.
Blasco further admitted to the court that he had blacked out on previous occasions as a result of excessive drinking:
Q. Well, what do you think? Do you drink all the time excessively and in great consumptions?
A. When I get started, yes. It tends to get more than what I am supposed to be drinking.
Q. How often have you lost your memory and blacked out; about five times in your life?
A. Right.
Q. But you have been drunk excessively?
A. Yes.
[5] On cross examination, however, Blasco admitted he had no documentation to support his assertion that his air bag lights had been malfunctioning and/or that the problem had been addressed by the Acura dealer.
[6] Mr. Potts admitted that the Acura Legend was not in the same condition when he inspected it as it was on the date of the crash.
[7] With reference to Dr. McElroy, defense counsel specifically argued as followed:

"He may have used NHTSB. They have said, no, there were none. There were no other accidents of this make and model. That Ladies and Gentlemen, was the bold faced lie. It just so happened, I happen to have done the same survey. And it just so happened, I could see him in his chair looking at the same information I was. And he sat here and denied that there were any other reports of the air bags prematurely inflating on 1992 Acura Legends. I asked him to take the report that he had, look at it again, and read this time what was on that report of Acura Legends, 1992 Acura Legends.
It said on one report driving approximately 55 miles per hour on an interstate highway, hit a stone on the left front tire. The air bag deployed without prior warning. The second one, while driving, with no warning, both driver and passenger bag deployed, causing loss of control. The third, the air bag deployed when the vehicle exited off a freeway vehicle ran into a pothole and the left tire struck a pothole. Those three reports were made by citizens. The NHTSB gather data from the citizens, people that wish to write. It could be engineers. It could be citizens that have had accidents. We don't know. It's simply an information gathering process by the Federal Government. He is the one who volunteered that he went to NHTSB. He found nothing. That was a complete lie."
[8] The trial court specifically stated in this regard that:

In settlement, Mr. Zalanka was called to testify regarding statements made by Defendant to the witness at the time of the incident. Further, Mr. Zalanka was disclosed by the State to defense counsel in the initial discovery.
[9] We know this because the transcript reveals that during the jury's deliberations, the jury specifically requested to see Zalanka's report. The trial court informed them that they had to rely upon their recollection of Zalanka's testimony since his actual report was never admitted into evidence.
[10] During its closing, the state offered Blasco's extreme intoxication as another reason for Blasco's temporary blackout.
[11] Blasco rather raises the mere possibility that Dr. McElroy did not possess the requisite knowledge and experience to qualify him as an expert in auto safety and air bag design and engineering. Any such assertion is completely belied by the transcript of his defense counsel's closing argument to the jury. It is clear that the defense's challenge to Dr. McElroy was only as to his veracity and not as to his qualifications as an expert:

[Defense Counsel] "He sat here, after explaining to you his qualifications, he is an engineer, industrial engineering. Master's Degree. But what is a person that has a Master Degree certificate of society of automotive engineer, he has lots of experience. He is a certified expert of accident reconstruction. What is a person like that who is called an expert. He is a liar. Period. It doesn't make any difference what kind of credentials he has. He is a liar. This man was a liar." [Emphasis added]